[No. 84940-4.   En Banc.]
Argued October 6, 2011.       Decided September 27, 2012.

DAVID KOENIG, *Respondent*, v. THURSTON COUNTY ET AL.,
*Petitioners*.

838

*Jon Tunheim, Prosecuting Attorney,* and *Jeffrey G. Fancher, Deputy,* for petitioners.

*William J. Crittenden,* for respondent.

*Michael C. Kahrs* and *Shelley M. Hall* on behalf of Washington Coalition for Open Government, amicus curiae.

*Amy I. Muth, Travis Stearns,* and *Suzanne L. Elliott* on behalf of Washington Defender Association and Washington Association of Criminal Defense Lawyers, amici curiae.

*Michele L. Earl-Hubbard* and *Christopher Roslaniec* on behalf of Allied Daily Newspapers of Washington, amicus curiae.

*Margaret Ji Yong Pak, Nancy Talner,* and *Douglas B. Klunder* on behalf of American Civil Liberties Union of Washington, amicus curiae.

¶1 MADSEN, C.J. — David Koenig and Thurston County seek review of a decision by the Court of Appeals holding that a special sex offender sentencing alternative (SSOSA) evaluation may be disclosed under the Public Records Act (PRA), chapter 42.56 RCW, but a victim impact statement may not. The Court of Appeals found that both the SSOSA evaluation and the victim impact statement are investigative records. The court then determined the victim impact statement is exempt under the essential-to-effective-law-enforcement prong of the investigative records exemption but concluded the SSOSA evaluation was not exempt.

¶2 We hold neither the SSOSA evaluation nor the victim impact statement is an investigative record within the meaning of RCW 42.56.240. Accordingly, we reverse in part and affirm in part.

## FACTS

¶3 In July 2000, James Lerud pleaded guilty in Thurston County Superior Court to eight counts of voyeurism.[1] The plea agreement included a SSOSA recommendation and a psychological evaluation prepared in connection with that recommendation. The purpose of a SSOSA evaluation is to determine whether a sex offender is amendable to treatment and can be safely treated in the community. Before sentencing, one of Lerud's victims submitted a victim impact statement. A victim impact statement is a statement made by a victim regarding the extent of harm caused by a

---

[1] *State v. Lerud*, No. 00-1-00336-0 (Thurston County Super. Ct., Wash. 2000).

criminal defendant "at sentencing and at any proceeding where the defendant's release is considered." Const. art. I, § 35.

¶4 On August 17, 2000, David Koenig sent a PRA request[2] to the Thurston County Prosecuting Attorney's Office seeking files concerning Lerud's prosecution, including witness statements, victim impact statements, and any and all associated documents or affidavits. Koenig sent a similar request to the Thurston County Superior Court Clerk's Office. The clerk's office invited Koenig to come to the courthouse to view Lerud's case file and also informed him that a motion to seal particular documents in the file would be heard the following week. After the hearing on the motion to seal, the trial court ordered the victim impact statement and Lerud's medical and psychological reports, including the SSOSA evaluation, to be sealed from public disclosure in order to protect the victim's and Lerud's privacy.

¶5 Subsequently, the prosecutor provided Koenig with a document package that excluded the victim impact statement and SSOSA evaluation. The prosecutor believed the victim impact statement and SSOSA evaluation to be exempt from disclosure because of their sensitive nature and the trial court's ruling to seal the documents.

¶6 On September 3, 2004, Koenig filed a public disclosure complaint against Thurston County and the prosecuting attorney. Then, on August 30, 2007, he moved for partial summary judgment on the issue of whether the SSOSA evaluation and victim impact statement were exempt from public disclosure. The trial court ruled that the victim impact statement and SSOSA evaluation were exempt under RCW 42.56.240(1) and rejected Koenig's motion. The parties stipulated that the trial court's order to seal the

---

[2] At the time the former public disclosure provisions of chapter 42.17 RCW (the public disclosure act) applied. Since 2005, public records requests have been governed by the PRA, chapter 42.56 RCW. Since the relevant provision of the two statutes is the same, the PRA will be cited for ease of reference.

documents was not binding on Koenig and did not restrict the prosecutor's disclosure of the documents under the PRA.

¶7 The Court of Appeals found the victim impact statement exempt and the SSOSA evaluation nonexempt. We granted Thurston County's petition for review.

## ANALYSIS

¶8 We review an agency's action under the PRA de novo. RCW 42.56.550(3). An appellate court stands in the same position as the trial court where the record consists only of affidavits, memoranda, and other documentary evidence. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252, 258, 884 P.2d 592 (1994) (*PAWS II*). Because the relevant portions of the record consist of declarations submitted by Thurston County, this court stands in the same position as did the trial court.

¶9 It is well settled that a reviewing court interprets the disclosure provisions of the PRA liberally and exemptions narrowly. *Id.* at 251. RCW 42.56.550(3) dictates that "[c]ourts shall take into account the policy of this chapter that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others." The agency claiming the exemption bears the burden of proving that the documents requested fall within the scope of the exemption. *Cowles Publ'g Co. v. Spokane Police Dep't*, 139 Wn.2d 472, 476, 987 P.2d 620 (1999).

¶10 Thurston County argues that the victim impact statement and SSOSA evaluation are exempt under the investigative records exemption, RCW 42.56.240, which provides in relevant part:

> The following investigative, law enforcement, and crime victim information is exempt from public inspection and copying under this chapter:
>
> (1) Specific intelligence information and specific investigative records compiled by investigative, law enforcement, and

penology agencies, and state agencies vested with the responsibility to discipline members of any profession, the nondisclosure of which is essential to effective law enforcement or for the protection of any person's right to privacy.

■ ■ ¶11 The investigative records exemption is designed to protect the integrity of law enforcement investigations. *See Spokane Police Dep't*, 139 Wn.2d at 478. To be exempt under this provision (1) the record must be investigative in nature; (2) the record must be compiled by an investigative, a law enforcement, or a penology agency; and (3) it must be essential to law enforcement or essential to the protection of privacy. *See Cowles Publ'g Co. v. Wash. State Patrol*, 109 Wn.2d 712, 728, 748 P.2d 597 (1988). In particular, records are " 'specific investigative records' " if they were " 'compiled as a result of a specific investigation focusing with special intensity upon a particular party.' " *Dawson v. Daly*, 120 Wn.2d 782, 792-93, 845 P.2d 995 (1993) (quoting *Laborers Int'l Union of N. Am., Local No. 374 v. City of Aberdeen*, 31 Wn. App. 445, 448, 642 P.2d 418 (1982)), *overruled on other grounds by PAWS II*, 125 Wn.2d at 257-58. The investigation must be "one designed to ferret out criminal activity or to shed light on some other allegation of malfeasance." *Columbian Publ'g Co. v. City of Vancouver*, 36 Wn. App. 25, 31, 671 P.2d 280 (1983).

¶12 In *Dawson*, the documents at issue were compiled by the Snohomish County Prosecutor's Office for use in cross-examining Mr. Daly, an expert witness who frequently testified as a defense witness in child sexual abuse cases prosecuted by Snohomish County. 120 Wn.2d at 787-88. The county argued that these documents were protected by the investigative records exemption.[3] *Id.* at 792. In rejecting the county's claim, we held the prosecutor failed to demonstrate that Daly was being investigated for criminal activity or " 'other malfeasance' " or that the records concerning

---

[3] The county also claimed the documents were exempt under the discovery rules exemption and the deliberative process exemption. These are not at issue in this case.

Daly contain any intelligence information. *Id.* at 793. Accordingly, we held that these records were "not of the type protected" by the exemption. *Id.*

¶13 This analysis yields the same result with regard to the documents in this case.

Victim Impact Statement

¶14 Washington State Constitution article I, section 35 and RCW 7.69.030 grant the victims of crime and their survivors a significant role in the criminal justice system. *See State v. Gentry*, 125 Wn.2d 570, 624, 888 P.2d 1105 (1995) (discussing legislative history and purpose of victim impact statement). A victim impact statement is a vehicle for a victim to exercise her constitutional and statutory right to address the trial court before it imposes sentence. A victim impact statement gives victims an independent voice and direct access to the court.

¶15 A victim impact statement is properly understood as a communication between a victim and the court, not as an investigative record compiled by an investigative, a law enforcement, or a penology agency. In *State v. Carreno-Maldonado*, 135 Wn. App. 77, 86, 143 P.3d 343 (2006), the court discussed the victim's control over victim impact statements:

> Article I, section 35 and RCW 7.69.030 give the victims the right to speak or not speak on their own behalf. But they do not provide the State with the right to speak for the victims when they have decided not to speak and have not requested assistance in otherwise communicating with the court, such as by presenting a victim impact statement. Here, the victims were present and able to speak or ask for the prosecutor's assistance if they so desired. The record does not show that the victims asked the prosecutor to serve as their proxy, either by speaking on their behalf, by reading a victim impact statement they had prepared, or by giving the court specific documents supporting a request for restitution.

¶16 Similar to the situation in *Dawson*, the county here has not demonstrated that the victim impact statement

contains "specific intelligence information" and the county points to nothing in the victim impact statement that relates to "ferreting out" criminal activity or other allegations of misfeasance. A victim impact statement is not an "investigative record" as that term is understood in our cases.

¶17 Thurston County argues, though, that the victim impact statement serves an additional investigatory function in helping the prosecutor and the court determine the seriousness of the crime for sentencing purposes. *See* RCW 9.94A.010(1), .500(1). The county likens the victim impact statement to the mitigation package submitted in *Cowles Publishing Co. v. Pierce County Prosecutor's Office*, 111 Wn. App. 502, 45 P.3d 620 (2002). In *Pierce County Prosecutor's Office*, 111 Wn. App. at 508, a mitigation expert submitted a mitigation package on behalf of a defendant to assist a prosecutor in deciding whether to seek the death penalty. The prosecutor relied on the mitigation package to investigate the defendant's background and family as part of a larger investigation into an appropriate penalty. *Id.* The court noted that whether the investigative records exemption applied to protect the mitigation package hinged on showing both that the record was compiled by law enforcement and that it was investigative in nature. *Id.* The court concluded the mitigation package satisfied both requirements. *Id.* According to Thurston County, the victim impact statement here is analogous to the mitigation package because both are used to determine the appropriate penalty for a criminal defendant.

¶18 We do not see the similarity between a mitigation package, presented pretrial for the purpose of assisting the prosecutor in deciding whether to seek the death penalty by filing a notice of special proceedings, and a victim impact statement. Once a person is charged with aggravated first degree murder, a prosecutor may seek the death penalty by filing and serving a notice of special sentencing proceedings

within 30 days after the defendant's arraignment.[4] RCW 10.95.040(2). A notice of special proceedings may be filed *only* when there is reason to believe there are not sufficient mitigating circumstances to merit leniency. RCW 10.95-.040(1). The prosecutor is empowered with substantial discretion and autonomy in making the determination to seek a sentence of death. *State v. Dictado*, 102 Wn.2d 277, 297-98, 687 P.2d 172 (1984). To make the decision, the prosecutor must be free to investigate a defendant's background and family, and the evidence in the case without being influenced by public opinion and scrutiny. *See Gubiensio-Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir. 1988).

¶19 The decision to seek the death penalty is properly considered a charging decision. *State v. Bartholomew*, 104 Wn.2d 844, 848-49, 710 P.2d 196 (1985); *Dictado*, 102 Wn.2d at 297-98. In contrast, a victim impact statement is not part of a charging decision. It is considered after the charging phase of a case is closed and the investigation is complete. *See Spokane Police Dep't*, 139 Wn.2d at 483-84 (Talmadge, J., concurring). Further, there is no statute similar to RCW 10.95.040(1) requiring the prosecutor to consider mitigation evidence in a noncapital case.

¶20 Victim advocates may send out victim impact statement forms to victims. However, this action does not make a victim impact statement a part of a criminal investigation.

¶21 Moreover, defining "investigative records" to include all documents that may affect sentencing or penalty decisions regardless of whether they further a prosecutor's investigatory function ignores the limited nature of the PRA's exemptions. *See PAWS II*, 125 Wn.2d at 251, 258. In addition, that a document lies within a prosecutor's file

---

[4] Although the decision to charge aggravated first degree murder and the decision to seek the death penalty occur at different times, the death penalty decision necessarily follows the decision to charge aggravated first degree murder, both decisions are made by the prosecutor at the beginning of a prosecution, and both result from a prosecutor's investigation into the evidence.

cannot transform a document into an investigative record. Assuming a document in a prosecutor's file can qualify as an investigative record, it must be part of an investigation that the prosecutor conducts. *See, e.g., Pierce County Prosecutor's Office,* 111 Wn. App. at 508.

¶22 Because the victim impact statement is not part of a prosecutor's investigation into criminal activity or alleged malfeasance, the investigative records exemption does not apply.[5]

SSOSA Evaluation

¶23 The county also argues that the SSOSA evaluation plays an important role in law enforcement. It claims that the evaluation is an effective tool in plea negotiations and in rehabilitating sex offenders. The county is concerned that disclosure of SSOSA evaluations will discourage defendants from pursuing this sentencing alternative, to the detriment of community safety.

¶24 We do not doubt the value of SSOSA evaluations. Indeed, we have recognized that the legislature developed this sentencing alternative for first time offenders to prevent future crimes and protect society. *State v. Young,* 125 Wn.2d 688, 693, 888 P.2d 142 (1995). However, while a SSOSA evaluation serves many important functions, the question we must decide is whether a SSOSA evaluation is "specific intelligence information" or a "specific investigative record."

---

[5] Justice Chambers claims the victim impact statement in this case "was created as a result of a specific investigation focusing on a particular party." Dissent (Chambers, J.) at 852. Yet, he fails to explain how the victim impact statement was part of an investigative, law enforcement, or penology agency's investigation. Instead, he acknowledges that a victim impact statement factors into a court's decision-making process at sentencing. *Id.* Similarly, Justice J.M. Johnson would adopt a "comprehensive view of a criminal investigation" and would find the " 'investigative' " requirement to be satisfied anytime a record is somehow connected to ascertaining an appropriate penalty. Dissent (J.M. Johnson, J.) at 856. Because most everything a prosecutor does is connected in some respect to determining what, if any, penalty is appropriate in a given case, under his rule, a prosecutor generally need only put a record in his or her case file for it to be an investigative record.

¶25 For largely the same reasons that a victim impact statement is not exempt under the investigative records exemption, a SSOSA evaluation also is not exempt. The evaluation is not prepared in an effort to " 'ferret out criminal activity' " or to " 'shed light on some other allegation of malfeasance.' " *Dawson*, 120 Wn.2d at 793 (quoting *Columbian Publ'g Co.*, 36 Wn. App. at 31). Instead, the evaluation is a useful tool after a criminal investigation has been conducted.[6] A prosecutor may rely on a SSOSA evaluation to recommend a SSOSA sentence or discourage a court from imposing the sentencing alternative, but it is generally the defendant who requests a sentencing alternative and the judge who makes the decision. While a prosecutor may make such a recommendation, he or she is not conducting an investigation but is merely taking the SSOSA evaluation into consideration while providing input to the court on a decision the court must make.

¶26 As with the victim impact statement, a prosecutor may, but need not, have a role in a SSOSA evaluation being prepared and subsequently used by the court. RCW 9.94A-.670(3). The evaluation is a requirement for consideration of a SSOSA alternative. RCW 9.94A.670(3). It is used by a sentencing court to determine whether a defendant charged with a sex offense is amenable to treatment. *Id.* The evaluation also assists the court in determining whether the community will benefit from use of the SSOSA alternative, which requires treatment but allows for a reduced jail term. RCW 9.94A.670(4)-(5).

¶27 Although a prosecutor may bring a motion to order an examination, it is within the court's discretion to determine whether to grant the motion. RCW 9.94A.670(3). The sentencing court also may order a SSOSA evaluation on its own motion. *Id.* Regardless of the prosecutor's preference,

---

[6] We recognize that a prosecutor may factor in the results of a SSOSA evaluation in negotiations with the defendant. However, to consider this negotiation as a part of the criminal investigation is an overbroad interpretation of criminal investigation and contrary to the directive that exemptions in the PRA be narrowly construed. RCW 42.56.550(3).

the judge may then impose a SSOSA sentence. RCW 9.94A-.670(4). As the SSOSA statutes make clear, the extent of a prosecutor's participation in a SSOSA evaluation differs greatly from the discretion exercised in deciding whether to file a notice of special proceedings. In the latter case, a mitigation package provides a prosecutor essential information necessary to decide whether a defendant will face the death penalty, a charging decision that the prosecutor must make after investigation. A SSOSA evaluation is not analogous. The prosecutor here did not conduct the important investigation into Lerud's capacity for treatment and the prosecutor did not make the determination as to whether treatment was ultimately appropriate.

¶28 A SSOSA evaluation is not an investigative record.

¶29 Because we conclude that neither a victim impact statement nor a SSOSA evaluation comes within the investigative records exemption, we do not consider whether these documents are essential to effective law enforcement or for the protection of any individual's right to privacy.

## CONCLUSION

¶30 When applying the investigatory records exemption, a court must find that an investigative entity is compiling and using the relevant record to perform an investigative function. RCW 42.56.240(1). It is not enough that a prosecutor consider a document or even that the document may be useful in making a sentencing recommendation to the court. A victim impact statement is primarily a communication between a victim and a judge and the SSOSA evaluation principally provides a basis for the court to impose sentencing alternatives. CONST. art. I, § 35; RCW 7.69.030; RCW 9.94A.670(3)-(5). Neither of these records is part of an investigation into criminal activity or an allegation of malfeasance.

¶31 Because the PRA requires that exemptions be narrowly construed, we decline to protect documents that are

created to aid a court in its sentencing decision. We reverse the Court of Appeals decision that the victim impact statement is an investigative record and affirm its decision that a SSOSA evaluation is not.

¶32 Finally, we remand this matter to the trial court for an award of reasonable attorney fees, including fees on appeal, and penalties pursuant to RCW 42.56.550(4).

C. JOHNSON, OWENS, FAIRHURST, and STEPHENS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶33 CHAMBERS, J. (dissenting) — I do not believe the people or the legislature intended that the most sensitive information of victims of a crime, especially a sex crime, should be revealed to newspapers and the public, causing victims to be victimized all over again. But the majority holds that a victim impact statement (VIS) and a special sex offender sentencing alternative (SSOSA) evaluation are not investigative records and therefore have no protection at all under the Public Records Act (PRA), chapter 42.56 RCW. As a result, the information cannot even be redacted to protect a victim from publication of the victim's identity and sordid details of the crime. Because I think this holding goes too far, I respectfully dissent.

¶34 The PRA exempts from disclosure investigative records compiled by law enforcement agencies. RCW 42.56-.240(1). Such records are exempt if nondisclosure is essential (1) to effective law enforcement or (2) for the protection of any person's privacy. *Id.* A person's privacy is violated by disclosure if the information "(1) [w]ould be highly offensive to a reasonable person" and "(2) is not of legitimate concern to the public." RCW 42.56.050.

*a. VIS*

¶35 Instead of engaging in an analysis of either the effective law enforcement or privacy prongs of the PRA

investigative records exception, the majority holds that the VIS and SSOSA evaluation are not investigative records. The majority first attempts to distinguish the VIS. It states that a VIS is not an investigative record because it does not relate to ferreting out criminal activity and because it is not like a mitigation package. Majority at 844-47. Neither of these arguments holds up to scrutiny.

¶36 As the majority points out, we have held that a cross-examination of a defense witness prepared by the prosecution was not an investigative record. *Dawson v. Daly*, 120 Wn.2d 782, 792-93, 845 P.2d 995 (1993), *abrogated on other grounds by Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 257-58, 884 P.2d 592 (1994). We explained that an investigative record was a record " 'compiled as a result of a specific investigation focusing with special intensity upon a particular party.' " *Id.* (quoting *Laborers Int'l Union of N. Am., Local No. 374 v. City of Aberdeen*, 31 Wn. App. 445, 448, 642 P.2d 418 (1982)). We further explained that the investigation had to be " 'designed to ferret out criminal activity or to shed light on some other allegation of malfeasance.' " *Id.* at 793 (quoting *Columbian Publ'g Co. v. City of Vancouver*, 36 Wn. App. 25, 31, 671 P.2d 280 (1983)). We ultimately held the documents in *Dawson* were not investigative records in part because there was no criminal investigation focusing on the defense witness. *Id.*

¶37 *Dawson* is factually distinct from this case. In *Dawson*, the documents were not investigative because they had no specific connection to the case against the defendant. Rather, the documents were "compiled for use in cross-examining an 'expert' witness (the requesting citizen) who frequently testifies as a defense witness in child sexual abuse cases prosecuted in Snohomish County." *Id.* at 786-87. They were prepared by the Snohomish County prosecutor's office "for use in challenging his qualifications, in cross-examining him, and in attempting to impeach him when he appears as a defense witness in child sexual abuse

prosecutions." *Id.* at 787. One of the requested files, for example, had been used "in preparing for two previous prosecutions." *Id.* The *Dawson* documents thus did not fit the definition because they were not prepared as a result of any particular investigation but as a result of dealing with a particular expert witness over the course of multiple cases. The VIS at issue here, on the other hand, was created as a result of a specific investigation focusing on a particular party. That is how we have defined "investigative record." *Id.* at 792-93.

¶38 The majority also distinguishes the VIS from a mitigation package, which our Court of Appeals has held is an investigative record. *Cowles Publ'g Co. v. Pierce County Prosecutor's Office,* 111 Wn. App. 502, 508, 45 P.3d 620 (2002). The majority implies that a prosecutor is required to consider a mitigation package in capital cases before making a decision whether to seek the death penalty. Majority at 845-46. On the contrary, although a prosecutor is required to make an individualized determination, there is no requirement that a prosecutor must consider a mitigation package. *State v. Pirtle,* 127 Wn.2d 628, 642, 904 P.2d 245 (1995). Like the VIS, the evidence in a mitigation package may be considered at the penalty phase, after the prosecutor has made a charging decision. *See id.* at 671 (defendant may introduce mitigating evidence at the special sentencing proceeding). In reality, there is little practical difference for PRA purposes between a mitigation package, wherein a defendant collects information intended to affect sentencing, and a VIS, which a court "shall consider" during the sentencing phase. RCW 9.94A.500(1). Both are compiled as a result of an investigation of criminal activity focusing on a particular party. *Dawson,* 120 Wn.2d at 792-93. Ultimately both are intended to affect the sentence. I would therefore hold both are investigative records.

¶39 Concluding the VIS in this case is an investigative record does not end the inquiry. Investigative records are

exempt only if nondisclosure is essential either to effective law enforcement or for the protection of any person's privacy. RCW 42.56.240(1). Disclosure is prohibited under the privacy prong if disclosure of the information would be highly offensive to a reasonable person and the information is not of legitimate concern to the public. RCW 42.56.050. There is no doubt that disclosure to the public of the victim's identifying information and the impact of sex related crime on the victim's personal life would be highly offensive to a reasonable person. The first prong of the privacy test is satisfied under these circumstances.

¶40 We have said that to determine the second prong—whether the information is of legitimate concern to the public—courts must weigh the public interest in efficient government against the public interest in disclosure. *Dawson*, 120 Wn.2d at 798-99. This analysis is not always easy. The public interest in disclosure arises because the public has an interest " 'in knowing what their public officers are doing in the discharge of public duties.' " *Id.* (quoting *Stone v. Consol. Publ'g Co.*, 404 So. 2d 678, 681 (Ala. 1981)). But the VIS is only tangentially related to what public officers are doing. It is a document created by the victim of a crime that explains the impact of the crime on the personal life of the victim. It bears so little relationship to the monitoring of government officials by the public that it is difficult to apply the standard we have established. An approach based upon the plain language of the statute suggests that the public does not have a legitimate interest in the continuing effects of a crime on a victim's personal life. *See* RCW 42.56.050.

¶41 Some parties in this case have argued the public has a legitimate interest in monitoring how a VIS impacts sentencing. *E.g.*, Br. of Appellant at 22. But even if a VIS contained some information in which the public has a legitimate interest, the PRA provides for redaction of other

information that is not of legitimate interest. RCW 42.56-.210. Information in the VIS that identifies or enables identification of the victim is plainly exempt and must at the very least be redacted.

### b. *The SSOSA Evaluation*

¶42 A similar analysis applies to the SSOSA evaluation. The majority states that a SSOSA evaluation is not an investigative record because it was not prepared in an effort to ferret out criminal activity. Majority at 848. But, again, that is not our definition of an "investigative record." An investigative record is one that is created as a result of a specific investigation focusing on a particular party. *Dawson*, 120 Wn.2d at 792-93. It is the investigation, not the record itself, we require to be for the purpose of ferreting out criminal activity. *Id.* at 793. Further, the similarities between a SSOSA evaluation and a mitigation package are even more striking than in the case of a VIS. Both a SSOSA evaluation and a mitigation package are prepared by digging deep into the personal life of the defendant, and both are presented to the prosecutor and the court for the purpose of affecting the sentence in a manner favorable to the defendant. I would hold that the SSOSA evaluation is also an investigative record.

¶43 Like the VIS, serious privacy concerns are implicated by the release of a SSOSA evaluation to the public. These SSOSA evaluations contain, among other things: a detailed sexual history section; mental health history; medical history; drug and alcohol history; a social history section, which may contain details of "abuse the individual may have suffered in the past, including physical, sexual, and emotional abuse"; results of a polygraph examination, which may be "extremely detailed" regarding past and current sexual practices; and results of a phallometric test that measures the defendant's arousal response to a variety of pornography. Clerk's Papers at 112 (Decl. of Amy Muth).

Making public much of this information would be highly offensive to a reasonable person, and the legitimacy of the public's interest in this information is minimal. *See* RCW 42.56.050.

¶44 The problems that arise when we attempt to apply the PRA to ever expanding types of information and documents are well illustrated by the present case. The PRA was a great idea. Unfortunately, too many terms are undefined. This court has followed the legislative command to interpret the PRA liberally and its exceptions narrowly, and the result is that the few protections found in the PRA have been steadily eroded. We have now reached the point where it is not even possible to redact the name of a sex crime victim from material provided to the public. This dissent does not have the force of law. Only the legislature can amend the act and establish appropriate protections. I urge the legislature to do so.


¶45  J.M. Johnson, J. (dissenting) — Our legislature has recognized that effective law enforcement and individual privacy rights outweigh the public's interest in the disclosure of certain information. Accordingly, the Public Records Act (PRA)[7] expressly exempts "investigative records," the disclosure of which would impair these interests. RCW 42.56.240(1). Contrary to the plain language of this statute and our decisional law interpreting its scope, the majority holds two highly sensitive records that were compiled by a prosecutor—a victim impact statement (VIS) and a special sex offender sentencing alternative (SSOSA) evaluation—must be publicly disclosed.

¶46  Protection of the VIS is also required by Amendment 84 to the Washington Constitution, which was adopted just to protect victims and ensure their participation in the criminal process.

---

[7] Ch. 42.56 RCW.

¶47 The majority claims both these documents were not "created" as part of an "investigation." Majority at 849-50. This disregards David Koenig's express characterization of these records as "investigative files" in his written public records request. The majority's analysis also demonstrates a fundamental misunderstanding of the elements that make records "investigative" by focusing on the reason for the records' *creation* rather than the purpose for which they were *compiled*.

¶48 Continuing this erroneous analysis, the majority puts forth a shortsighted definition of an "investigation." Under the majority's reasoning, a criminal investigation terminates when the defendant has been convicted and does not include sentencing proceedings. Yet, a criminal prosecution is not finalized until the entry of a judgment and sentence. I dissent because our law embraces a more comprehensive view of a criminal investigation and encompasses the determination of a proper sentence. I would therefore hold that the PRA exemptions contained in RCW 42.56.240(1) extend to documents held by the prosecutor for the purpose of evaluating an appropriate penalty, such as the VIS and SSOSA evaluation at issue here. This dissent would protect the private crime statement of victims as our law (and constitution) intends, preserving the balance of rights suggested by Amendment 84.

ANALYSIS

I. The SSOSA Evaluation and the VIS Are "Specific Investigative Records" Because They Were Compiled as Part of the Prosecutor's Charging Decisions or Investigation into an Appropriate Sentence

¶49 I agree with Justice Chambers in dissent that both the VIS and the SSOSA evaluation are investigative records. I write separately on this topic to emphasize additional errors I perceive in the majority's reasoning.

## A. *The SSOSA Evaluation*

¶50 First of all, Koenig did not even dispute that the SSOSA evaluation is an investigative record. In fact, his initial PRA request asked for *"Investigative files* associated with Case # 00103360." Clerk's Papers (CP) at 37 (emphasis added). Koenig's trial briefing indicated an "agree[ment] that the SSOSA psychological evaluation is an 'investigative record.'" CP at 257. In his appellate brief, Koenig stated he "[a]ssume[d], *arguendo*" that the SSOSA evaluation is investigative and did not make any argument to the contrary. Br. of Appellant at 29. The Court of Appeals agreed with Koenig that the SSOSA evaluation is investigative. *Koenig v. Thurston County*, 155 Wn. App. 398, 412-13, 229 P.3d 910 (2010) ("Koenig assumes that a SSOSA evaluation is an investigative record compiled by law enforcement . . . . We agree."). Koenig did not assign error to this conclusion, nor did he raise the issue in his answer and cross petition for review.

¶51 Under RAP 13.7(b), this court will not consider issues not raised in the petition for review or the answer: "If the Supreme Court accepts review of a Court of Appeals decision, the Supreme Court will review only the questions raised in . . . the petition for review and the answer." *See also Wood v. Postelthwaite*, 82 Wn.2d 387, 388-89, 510 P.2d 1109 (1973). We also decline to address issues that are not adequately briefed by the parties. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004) (This court "will not review issues for which inadequate argument has been briefed or only passing treatment has been made."). Because Koenig conceded that the SSOSA evaluation is an investigative record, Thurston County did not have reason or opportunity to brief the issue. Nor did the court request additional briefing on the matter. *See* RAP 12.1(b). Nevertheless, the majority concludes the SSOSA evaluation is not exempt from disclosure by answering a question that was not properly presented to the court.

¶52 If the issue were appropriately before us, we must conclude the SSOSA evaluation is an investigative record. I agree with Justice Chambers that, for PRA purposes, there is little difference between the SSOSA evaluation at issue here and the sentencing mitigation package in *Cowles Publishing Co. v. Pierce County Prosecutor's Office*, 111 Wn. App. 502, 508, 45 P.3d 620 (2002). Both were compiled by the prosecutor's office to use in its investigation into an appropriate sentence for incorporation into a final judgment and sentence.

## B. *The VIS*

¶53 Amendment 84 enshrined the rights of victims in the Washington State Constitution. Article I, section 35 declares, "Effective law enforcement depends on cooperation from victims of crime" and demands that victims of crime be treated with "due dignity and respect." WASH. CONST. art. I, § 35. To implement this constitutional objective, RCW 7.69.030(13) provides victims the right to prepare a VIS, with assistance from the prosecutor's office if requested. Courts are required to consider the victim's statement at sentencing. *See* RCW 9.94A.500(1) ("The court shall consider . . . any victim impact statement."). The VIS typically reveals personal details showing the extent of harm caused by the defendant and the crime's effect on the victim. In this case, the record shows the Thurston County Prosecutor's Office routinely requested a VIS from victims for its own sentencing investigations. CP at 278.

¶54 The majority rejects any similarities between the sentencing mitigation package in *Pierce County Prosecutor's Office* and the VIS in this case. Admittedly, both were submitted to the prosecutor for the same reason. In the majority's words, in *Pierce County Prosecutor's Office* "[t]he prosecutor relied on the mitigation package to investigate the defendant's background and family *as part of a larger*

*investigation into an appropriate penalty.*" Majority at 845 (emphasis added). Inexplicably, the majority can discern the investigative nature of determining an appropriate penalty in the context of a capital case but not in a sexual assault case. It appears to reach this conclusion based on rigid adherence to a timeline under which only pretrial activities can be "investigative." *See id.* According to the majority, because the decision to seek the death penalty is a "charging decision" made before trial, files related thereto are investigative. Majority at 846. Records related to any lesser penalty are apparently not "investigative" because they may be considered postconviction. This distinction is nonsensical; the VIS and the mitigation package are compiled and used by the prosecutor for the very same purpose—to investigate an appropriate penalty. The VIS undoubtedly may also affect the charging of a crime and whether to accept a guilty plea to a lesser crime. I join Justice Chambers' opinion that both the VIS and the SSOSA evaluation must be viewed as investigative records. *See* dissent (Chambers, J.) at 852.

C. *The Appropriate Inquiry Is the Reason the Records Were <u>Compiled</u>, Not How They Are Ultimately Used*

¶55 The majority concludes, "When applying the investigatory records exemption, a court must find that an investigative entity is compiling *and using* the relevant record to perform an investigative function." Majority at 849 (emphasis added). This statement illustrates the confusion leading the majority to its conclusion. "Specific investigative records" are not defined as such based on their *use*. Rather, a record is deemed investigatory solely based on the purpose for which it is compiled. *See Dawson v. Daly*, 120 Wn.2d 782, 792-93, 845 P.2d 995 (1993) (defining "specific investigative records" as those " *'compiled as a result of a specific investigation* focusing with special intensity upon a particular party' " (emphasis added) (quoting

*Laborers Int'l Union of N. Am., Local No. 374 v. City of Aberdeen*, 31 Wn. App. 445, 448, 642 P.2d 418 (1982))), *abrogated on other grounds by Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 257-58, 884 P.2d 592 (1994). If a record is compiled as part of a specific investigation, it is considered a "specific investigative record" regardless of how it is later used.[8]

¶56 Furthermore, a document created for one purpose may be compiled for a different, investigatory purpose. *Newman v. King County*, 133 Wn.2d 565, 572-73, 947 P.2d 712 (1997). The majority fails to distinguish the reasons SSOSA evaluations and VISs are created in the abstract from the reasons they were compiled by the prosecutor's office in this case. True, a VIS can be a mode of catharsis for the victim, giving the victim a voice in the sentencing process. A SSOSA evaluation informs the sentencing court whether a defendant is eligible for treatment and reduced jail time as part of the SSOSA program. *See* RCW 9.94A-.670(4), (5). Yet, despite some noninvestigatory functions of the VIS and SSOSA evaluation, the copies of the VIS and SSOSA evaluation *compiled by the prosecutor's office* were investigatory in purpose: They were sought out and collected as part of the prosecutor's sentencing investigation. When the focus is properly shifted to the motivation for compiling the documents, the SSOSA evaluation and VIS cannot be seen as anything other than investigatory.

---

[8] The majority cites only *Pierce County Prosecutor's Office* for the proposition an investigative record must be relied upon as "part of an investigation that the prosecutor conducts." Majority at 847 (citing *Pierce County Prosecutor's Office*, 111 Wn. App. at 508). Yet, the cited case contains no language suggesting an investigative record must be used or relied upon to be investigative. Instead, it declares the same standard set forth in *Dawson*: an investigative record is one " 'compiled as a result of a specific investigation focusing with special intensity upon a particular party.' " *Pierce County Prosecutor's Office*, 111 Wn. App. at 507 (internal quotation marks omitted) (quoting *Dawson*, 120 Wn.2d at 792-93).

## II. Nondisclosure Is "Essential to Effective Law Enforcement or for the Protection of Any Person's Right to Privacy"

### A. Redaction of Victim Identifying Information from the VIS Is Essential Because Disclosure Would Have a Chilling Effect on Victim Cooperation with Law Enforcement

¶57 Justice Chambers' dissent concludes disclosure of an unredacted VIS would violate victims' privacy rights.[9] I agree but submit that we need not reach the privacy prong of RCW 42.56.240(1) because nondisclosure of unredacted VISs must be held "essential to effective law enforcement."

¶58 The legislature has not specifically defined the parameters of the "essential to law enforcement" exception. When interpreting a statute, our aim is to give effect to the intent of the legislature, beginning with the statute's plain language. *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999). The plain language of RCW 42.56.240(1) does not convey that the exemption applies only if law enforcement would cease to function were the documents in question disclosed. If this were the standard, the provision would simply exempt records, the nondisclosure of which is "essential to law enforcement." Instead, the exemption asks whether nondisclosure is "essential to *effective* law enforcement." RCW 42.56.240(1) (emphasis added). In other words, it matters whether the *effectiveness* of law enforcement would be compromised by disclosure.

¶59 Effective law enforcement is thwarted without victim cooperation. The people amended our constitution, in part, to make this clear. Article I, section 35 of the Washington State Constitution now provides, "Effective law enforcement *depends* on cooperation from victims of crime."

---

[9] The privacy rights of third parties, such as prior victims of the same defendant, may also be implicated.

(Emphasis added.) In *Brouillet v. Cowles Publishing Co.*, this court defined "law enforcement" to include the "imposition of sanctions for illegal conduct" or the "imposition of a fine or prison term." 114 Wn.2d 788, 795-96, 791 P.2d 526 (1990) (quoting in part BLACK'S LAW DICTIONARY 474 (5th ed. 1979)). Simply put, law enforcement includes sentencing, and a criminal case is not final until the entry of a judgment and sentence. Effective sentencing requires information regarding the severity of the crime, including its effect on the victim. *See* RCW 9.94A.010(1), .500(1). VISs are a key source of this information and thus must be painfully accurate and truthful to assist in the sentencing process. VISs may also affect the charging and plea process, as previously noted.

¶60 To ascertain whether a record is essential to law enforcement, a court must consider affidavits submitted by those with knowledge of and responsibility for an investigation. *Newman*, 133 Wn.2d at 573. The county submitted a number of sworn statements attesting that VISs would not be complete and accurate or available at all if they were publically accessible. These sworn statements were not controverted. Elizabeth Timm Andersen, the author of the VIS that Koenig sought in this case, unequivocally stated:

> I would *not* have provided a Victim Impact Statement if I had been told that the statement would be a public document to be given to any and all who asked for it.

CP at 126. Catherine A. Carroll, legal director at the Washington Coalition of Sexual Assault Programs, stated:

> [I]f Victim Impact Statements were subject to public disclosure many victims of sexually violent crimes would not participate in the criminal justice system in any meaningful way.

CP at 117. According to David L. Johnson, executive director of the Washington Coalition of Crime Victim Advocates:

> Guaranteeing victims some sense of privacy is absolutely essential in enlisting their cooperation with the system . . . .

Victim Impact Statements are a very crucial part of the sentencing process.

CP at 123. Jon Tunheim, Thurston County prosecuting attorney, declared:

For many years, this office has taken a "victim centered" approach to prosecution. As part of that philosophy, I believe that a victim's privacy must be closely guarded and only compromised when necessary in the interests of justice. To do otherwise, in my view, creates a chilling effect on the willingness of victims to report crime, provide information and cooperate with the prosecution. Therefore, the protection of victim privacy is critical to the effectiveness of law enforcement and the criminal justice system. Furthermore, the legislature (RCW 7.69.010) has mandated that prosecuting attorneys vigorously protect the rights of crime victims which include the right to be treated with dignity, respect, courtesy and sensitivity. If I have knowledge that anything a victim may provide will be handed over to the public through a public disclosure request, this office will inform the victim of that possibility. It is my opinion that if a victim knows this, he or she will be unwilling to provide a true and accurate impact statement.

CP at 105-06. Kim H. Carroll, victim advocate for the Thurston County Prosecuting Attorney's Office, presented a similar view:

A victim should have the expectation of privacy. They have been violated enough by the act of the offender, but to know their raw emotions and most painful experiences as described in their own words could be released to the public upon a simple request, could lead the victim to decide not to make an impact statement. Such a result could seriously hinder investigations, prosecutions, and hope of recovery. . . . Asking a crime victim to provide a Victim Impact Statement and letting them know it would be available to anyone that asks for it would create a situation where crime victims would not be willing to provide intimate details of the true impact to their lives. . . . This has a tremendous negative impact on effective law enforcement.

CP at 277-78.

¶61 As these declarations establish, VISs would not be painfully accurate and some would not be available for sentencing purposes if available to the public at large. Effective law enforcement demands that these important sentencing tools be obtainable and that victims be encouraged to engage in the criminal justice system. *See Cowles Publ'g Co. v. Wash. State Patrol*, 109 Wn.2d 712, 736, 748 P.2d 597 (1988) (holding the names of officers under investigation were exempt as " 'essential to law enforcement' " because disclosure would have a chilling effect on reporting of misconduct); *Tacoma News, Inc. v. Tacoma-Pierce County Health Dep't*, 55 Wn. App. 515, 522, 778 P.2d 1066 (1989) ("Disclosing the identities of sources will discourage potential sources from providing important information in the future, and will therefore frustrate the investigative process.").

¶62 Koenig submitted no evidence to counter the county's declarations regarding the role of VISs in sentencing. Instead, he argues nondisclosure of VISs is not essential because a victim has discretion over what to include in her statement—if the victim does not want certain information released, she can leave it out (even if it is relevant and important). This argument ignores the important role of a candid VIS in sentencing. Even more importantly, requiring victims to censor their statements to eliminate the most chilling—and likely the most important—details would not show them the "due dignity and respect" required by our constitution. WASH. CONST. art. I, § 35; *see also* RCW 7.69.010 (declaring the legislature's intent that crime victims be treated with "dignity, respect, courtesy, and sensitivity" and that victim's rights are "honored and protected by law enforcement agencies, prosecutors, and judges").

¶63 Koenig also contends the confidentiality of a VIS is not essential because the victim may ultimately make a statement in open court. However, the VIS may contain additional details not shared in court and may be the only vehicle through which the victim will candidly explain the

crime's impact. Koenig's "open courts" argument also ig-
nores the distinction between court records—to which the
public has a common law right of access—and records
compiled by the prosecutor's office for an investigatory
purpose—which are exempt from disclosure under the PRA.
*See Nast v. Michels*, 107 Wn.2d 300, 303, 730 P.2d 54 (1986).

¶64 The county argues complete nondisclosure of the
VIS is required. Koenig counters that even if the VIS
contains some exempt information, the public must have
access to a redacted version. RCW 42.56.210(1) provides
that PRA exemptions "are inapplicable to the extent that
information, the disclosure of which would violate personal
privacy or vital governmental interests, can be deleted from
the specific records sought."

¶65 In *Koenig v. City of Des Moines*, a case involving
records of child sexual abuse, we held only the victim
identifying information could be redacted. 158 Wn.2d 173,
189, 142 P.3d 162 (2006). The remainder of the records,
including "sexually explicit details," was subject to disclo-
sure. *Id.* We explained:

> [E]ven if such records do contain sexually explicit information
> potentially deterring victims and their families from cooperat-
> ing with law enforcement, that effect is negated by the fact
> these details cannot be connected to a specific victim.

*Id.* at 187. Release of redacted records was required even
though a victim's identity could conceivably be established
through other sources:

> The fact a requester may potentially connect the details of a
> crime to a specific victim by referencing sources other than the
> requested documents does not render the public's interest in
> information regarding the operation of the criminal justice
> system illegitimate or unreasonable.

*Id.*; *see also Tacoma News*, 55 Wn. App. at 524 ("So long as
the identities of complainants and witnesses are not re-
vealed, disclosure of the facts alone will not have a 'chilling
effect' on the investigation and enforcement process.").

¶66 It may be that disclosure of a carefully redacted VIS would not always thwart effective law enforcement. The chilling effect of expected public disclosure will remain, only slightly ameliorated, by removing identifying details. *See Koenig v. City of Des Moines*, 158 Wn.2d at 187. Therefore, in some cases, while redaction of victim identifying information from VISs may help ensure the victim participation that is essential to law enforcement, some portions could be disclosed. Clearly, however, the majority opinion—by requiring disclosure of a complete and unredacted VIS—will impermissibly deter the victim contribution to law enforcement that our constitution deems essential.

B. *Redaction of Health Care Information and Information Identifying Third Parties from the SSOSA Evaluation Is Essential To Protect Privacy Rights*

¶67 Whether nondisclosure of a SSOSA evaluation is essential to effective law enforcement leaves more room for dispute. As Koenig and the Court of Appeals recognized, defendants have considerable incentives to participate in the SSOSA program, including the possibility of receiving a significantly reduced jail term. *Koenig v. Thurston County*, 155 Wn. App. at 415-16; RCW 9.94A.670(5). These incentives could outweigh any chilling effect that would result from disclosure. Moreover, the success of the SSOSA program is still a matter of debate. But, because disclosure of a SSOSA evaluation implicates the privacy rights of other parties and contains private information regarding sexual or personal matters, I join Justice Chambers' conclusion that portions of the SSOSA evaluation are exempt under the privacy prong of RCW 42.56.240(1). Dissent (Chambers, J.) at 854-55.

¶68 This conclusion is bolstered by the fact a SSOSA evaluation contains private "health care information" in which the public has no legitimate interest. RCW 70.02-.010(7) (" 'Health care information' means any information . . . that identifies or can readily be associated with the

identity of a patient and directly relates to the patient's health care.").[10] In enacting the Uniform Health Care Information Act, chapter 70.02 RCW, in 1991, the legislature found that "[h]ealth care information is personal and sensitive information that if improperly used or released may do *significant harm to a patient's interests in privacy*, health care, or other interests." RCW 70.02.005(1) (emphasis added). Even if health care information is held by a public agency (such as a prosecutor's office), the patient does not lose his or her privacy interest in the medical information therein. RCW 70.02.005(4) ("It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.").

¶69  To qualify as health care information, a record must contain two elements—patient identity and information about the patient's health care. *Prison Legal News, Inc. v. Dep't of Corr.*, 154 Wn.2d 628, 645, 115 P.3d 316 (2005). The SSOSA evaluation meets these criteria. Obviously, a SSOSA evaluation is linked to a specific patient—the sex offender. Others may also be discussed—including children. The SSOSA evaluation record also relates to the patient's health care, defined as "any care, service, or procedure provided by a health care provider . . . [t]o diagnose, treat, or maintain a patient's physical or mental condition." RCW 70.02.010(5)(a). The SSOSA evaluation is conducted by a certified sex offender treatment provider to diagnose the offender's mental and physical condition and propose a treatment plan. *See* CP at 100-03.

---

[10] The Court of Appeals declined to address whether information contained in a SSOSA evaluation is "health care information," stating the record on appeal was not sufficiently developed. The court seems to have misinterpreted the county's argument. The county does not assert that the SSOSA evaluation is independently exempt from disclosure under the Uniform Health Care Information Act, chapter 70.02 RCW. Instead, the provisions of the act bolster the county's position that the SSOSA evaluation contains private information in which the public has no legitimate interest.

¶70 There is no dispute that disclosure of information in a SSOSA evaluation would be highly offensive to a reasonable person. The critical question is whether the public has a legitimate interest in the details of a SSOSA evaluation. Public interest in a given piece of information is not legitimate "where 'the public interest in efficient government could be harmed *significantly more* than the public would be served by disclosure.' " *Koenig v. City of Des Moines*, 158 Wn.2d at 185 (quoting *Dawson*, 120 Wn.2d at 798).

¶71 In order for a SSOSA evaluation to be accurate, the patient must feel free to reveal highly personal information to a treatment provider. The sex offender treatment provider who conducted the SSOSA evaluation in this case avowed:

> It would be counterproductive to community safety for the SSOSA evaluations to become open to the public. It would make my job extremely difficult if not impossible to do. It is difficult to elicit and encourage the disclosure of sensitive information. It is essential the client undergoing a SSOSA evaluation be encouraged to be fully disclosing of vital sensitive information. Public disclosure would enable withholding and reduces the likelihood of discovery of additional victims and cause the victimization of innocent persons noted in the evaluation as well as the client.

CP at 103. The SSOSA program, the effective treatment of sex offenders, and the public interest in preserving the confidentiality of medical records would be significantly undermined by the threat of disclosure. These harms render any public interest in health care information contained in a SSOSA evaluation unreasonable. *See Dawson*, 120 Wn.2d at 799 ("[I]n light of the potential harm disclosure could cause, we hold that *legitimate* public *concern* is lacking in this case. . . . [D]isclosure could cause even greater harm to the public by making supervisors reluctant to give candid evaluations.").

¶72 A SSOSA evaluation may also identify the sex offender's current and past sexual partners, prior victims,

and family members. CP at 101. The public has no legitimate interest in information identifying these third parties. *See Pierce County Prosecutor's Office*, 111 Wn. App. at 510 ("[T]he family's privacy interests outweigh any public interest in the basis for the prosecutor's decision."). Furthermore, as discussed above in the context of VISs, disclosure of victim identities would have an intolerable chilling effect on victim cooperation with law enforcement. *See also* Daniel M. Murdock, Comment, *A Compelling State Interest: Constructing a Statutory Framework for Protecting the Identity of Rape Victims*, 58 Ala. L. Rev. 1177, 1177 (2007) (Rape is underreported largely because victims fear the public disclosure of their identities.). Thus, information in the SSOSA evaluation that reveals the identities of innocent third parties is not subject to disclosure.

¶73 The county argues nondisclosure of the entire SSOSA record is required because redaction of the exempt information would leave "little to disclose," citing *Pierce County Prosecutor's Office*, 111 Wn. App. at 511. As addressed above, the PRA demands that exempt information be redacted if possible. While exempt information may make up the majority of the SSOSA report, any other information is subject to disclosure. The public has a legitimate interest in the ultimate disposition of a SSOSA evaluation but not in the defendant's specific, detailed health care information or the identities of third parties. I would therefore hold the county may redact these particulars from the SSOSA evaluation to protect defendants' and third parties' privacy rights.

CONCLUSION

¶74 The PRA ensures agency accountability by demanding that the public be able to bear witness to the inner workings of government through public access to most records. This policy is not furthered by public disclosure of highly private information regarding nongovernment ac-

tors, especially victims of crime specifically protected by our constitution. By failing to appreciate this distinction, the majority orders disclosure of extremely sensitive information, including the identities of victims and specifics of their victimization. This is especially important for victims of violence and sexual abuse who are brave enough to assist law enforcement. Through purported adherence to the PRA's directive that exemptions be "narrowly construed," the majority nearly reads the investigative records exemptions out of existence. Ironically, the majority also disregards Koenig's express characterization of these documents he requested as "investigative records." The majority's decision will discourage victims of crime from participating in law enforcement and compel government agencies to commit gross privacy violations. The PRA does not require this result, but since it is the result reached by the majority, it is up to the legislature to make the investigative records exemptions to the PRA even clearer. I dissent.

WIGGINS, J., concurs with J.M. JOHNSON, J.

After modification, further reconsideration denied December 18, 2012.