# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Meretricious Relationship of ) ) )| No. 67734-9-I |
| SUSAN M. CALDWELL ) ) | DIVISION ONE |
| Appellant, ) ) | |
| and ) ) | |
| JOHN C. HANSELMAN, ) ) | UNPUBLISHED OPINION |
| Respondent. ) ) )| FILED: July 29, 2013 |

BECKER, J. — After her relationship with John Hanselman ended, Susan Caldwell petitioned the court for an equitable distribution of property acquired during the relationship. The trial court denied her petition. Caldwell acted pro se both at trial and on appeal. On appeal, Caldwell challenges the trial court's determination that the parties did not have a committed intimate relationship for purposes of an equitable division of property. We affirm.

Susan Caldwell and John Hanselman met in 2006. Caldwell lived in Reno, Nevada, at the time. She had previously lived in Washington and had family in the Port Angeles area. Hanselman visited Caldwell in Nevada, they "hit it off," and Hanselman invited Caldwell to live with him in Washington. In February 2007, Hanselman lent Caldwell money to relocate to Oak Harbor, Washington. Caldwell moved into Hanselman's house. Caldwell and

Hanselman lived together for approximately three years until she moved out in March 2010. During the relationship, Hanselman was self-employed and the owner of two businesses. He had a crabbing business that he ran during crabbing season and, during the off-season, operated a tree-clearing business. For the most part, Caldwell did not work outside the home while the parties lived together. A few months after she moved out of Hanselman's home, Caldwell petitioned the court for an equitable distribution of property.

During a two-day bench trial, the trial court considered the testimony of Caldwell, Hanselman, and several other family members. The court concluded that the evidence did not establish the existence of a committed intimate relationship. Therefore, there was no basis for the court to characterize and distribute property. Caldwell appeals.

As an initial matter, Hanselman requests that we dismiss Caldwell's assignments of error because they fail to "state the legal error appealed." But the applicable rule of appellate procedure requires only that the assignments of error must concisely state "each error a party contends was made by the trial court." RAP 10.3(a)(4). Caldwell complies with this rule by identifying the factual findings and legal rulings she challenges. To the extent that Caldwell fails to present legal argument and authority in support of each assignment of error, we do not address those particular assignments. See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We reject the request to dismiss.

Committed Intimate Relationship

Caldwell challenges the evidence supporting some of the trial court's factual findings and contends that the factual findings do not support the trial court's conclusion that the parties did not have a committed intimate relationship.

A committed intimate relationship is a "stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). The doctrine has equitable underpinnings. It evolved to protect unmarried parties who acquire property during their relationships so that one party is not unjustly enriched at the end of such a relationship. See In re Marriage of Pennington, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). There are no "elements" a party is required to prove to establish the existence of a committed intimate relationship. Instead, a court may consider several nonexclusive factors including: (1) continuity of cohabitation; (2) duration of the relationship; (3) purpose of the relationship; (4) pooling of resources and services for joint projects; and (5) the intent of the parties. Pennington, 142 Wn.2d at 601-02. These characteristic factors are neither exclusive nor hypertechnical. Pennington, 142 Wn.2d at 602. No one factor is more important than another, and the court will examine the particular circumstances of each case to determine if a committed intimate relationship exists. Pennington, 142 Wn.2d 602-03, 605. Contrary to the respondent's suggestion, a party seeking equitable distribution of property under

3

this doctrine is not required to produce evidence of engagement rings, an attempt to have children, or use of the other party's surname.

Whether a committed intimate relationship exists is a mixed question of fact and law; accordingly, we defer to the trial court's findings of fact, but we review de novo its legal conclusions from those findings. Pennington, 142 Wn.2d at 602-03. As a reviewing court, we do not substitute our judgment for the trial court's, weigh the evidence, or judge the credibility of the witnesses. In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

Caldwell claims the evidence does not support the trial court's finding that she briefly moved out of the house during the relationship or the finding that the parties' cohabitation was not continuous. Caldwell insists that the court's finding of lack of continuity was the basis for its determination that a committed intimate relationship did not exist because all other factors weighed in favor of finding that the parties had such a relationship.

But Hanselman testified that in 2009, after he and Caldwell had an argument, she moved out for two to three months. Hanselman also testified that while Caldwell was gone, his daughter, son-in-law, and granddaughter stayed at the house. Hanselman's testimony was corroborated by his son-in-law. Hanselman also testified that Caldwell left another time in 2008 and went to Nevada. The trial court was entitled to credit this testimony despite the fact that Caldwell denied moving out of the house before 2010, and Hanselman and his son-in-law were not specific about dates, did not testify as to where Caldwell

4

moved to, and did not say that she took all of her possessions from the house. Substantial evidence supports the trial court's findings that Caldwell moved out for brief periods in 2008 and 2009 and that the cohabitation was therefore not continuous.

But more importantly, the premise of Caldwell's argument is inaccurate. The trial court reached its conclusion based on several factors. Specifically, the court cited: "the lack of any pooling of resources and services for joint projects; the short duration of the relationship; the short term of the cohabitation; and the lack of mutual intent." The most significant factor detracting from Caldwell's claim, as reflected in the trial court's findings, was the lack of mutual intent to maintain a committed intimate relationship.

Caldwell and Hanselman provided strikingly divergent accounts of the relationship. Caldwell said the parties were emotionally close, committed to the relationship, and intimate with each other for the entire time they lived together. Caldwell testified that Hanselman asked her to marry him initially, but they decided not to marry right away because she had an "IRS problem." She conceded that at some point, they slept in separate bedrooms but claimed that was because of a medical condition and not indicative of any problems in the relationship. Hanselman, on the other hand, testified that the relationship deteriorated within the first year to the point that he asked her to move out and repeated that request several times during the period they lived together. According to Hanselman, the relationship had ended for all intents and purposes

5

in 2009 after he expressly told Caldwell they would never marry. He said they stopped sharing a bedroom shortly after Caldwell moved in and were no longer intimate after 2009.

Caldwell's contention that the parties mutually intended to be in a committed intimate relationship is based solely on her testimony and characterization of the relationship. The trial court, however, found Hanselman's conflicting testimony to be credible. And although the evidence supports the inference that the parties originally intended to have a committed, stable, and long-term relationship, according to Hanselman's testimony, that mutual intent did not persist beyond the initial phase of the relationship. Hanselman's testimony provides substantial support for the court's finding that, overall, the parties did not share a mutual intent to form a committed intimate relationship.

Citing the court's findings that she contributed her labor to various home-improvement projects and daily household chores, Caldwell challenges the trial court's determination that the parties did not jointly invest their time, effort, and financial resources to the extent required to form a committed intimate relationship. But Caldwell's argument fails to appreciate all of the court's factual findings on the issue, many of which do not suggest that the parties pooled their resources to a significant degree. For instance, while the court found that Caldwell contributed her labor to the household, the court found that she did this primarily at the beginning of the relationship. Later in the relationship, the court determined that Caldwell devoted her labor to a joint endeavor with her mother.

The court also found that the parties did not own any property together, share bank accounts or credit cards, jointly contribute to bills, mortgage payments, or payments toward any asset purchased during the relationship. The findings indicate that the parties did not engage in any joint long-term planning and that Hanselman did not carry Caldwell on his health insurance or name her as a beneficiary in any insurance policy or in his will.[1] And the parties did not share in Hanselman's income in general. Instead, Hanselman gave Caldwell money to buy groceries and paid for a few specific items on her behalf.

Although it is undisputed that Caldwell helped with maintenance and house projects and, at least initially, that she helped in Hanselman's businesses, she did not claim that her labor increased the value of any asset. The only evidence on this point suggested that Hanselman's house had lost value since he purchased it. Hanselman owned his businesses for several years prior to the relationship, and the trial court ruled on summary judgment that the businesses were his separate property. See Soltero v. Wimer, 159 Wn.2d 428, 435, 150 P.3d 552 (2007) (unlike marital dissolution, separate property is not before the court for distribution and there is a presumption that any increase in value of separate property during the relationship remains separate). Accordingly, the trial court's findings support its conclusion that Caldwell did not "substantially

---

[1] The court did find, however, that Hanselman carried Caldwell on his automobile insurance policy.

7

invest[] her time and effort into any specific asset so as to create any inequities."
Pennington, 142 Wn.2d at 605.

The trial court also determined that the parties' relationship and period of cohabitation was not long-term. The parties agreed that their relationship spanned approximately three and a half years and they lived together for three years. The court did not err in concluding that, in conjunction with a lack of mutual intent or significant pooling of resources, the relatively short-term relationship of less than four years did not support Caldwell's claim that the parties had a committed intimate relationship. See Connell, 127 Wn.2d at 346 (a short-term relationship may suffice, but only if other significant factors are present).

## Discrimination Against Pro Se Litigant

Caldwell also claims that the trial court discriminated against her because of her status as a pro se litigant and held her to a more stringent standard than the attorney representing Hanselman. Specifically, Caldwell claims the court treated her unfairly by ordering her to pay attorney fees of $300 to Hanselman early in the litigation. But Caldwell provides only the court's order imposing the sanctions, which suggests that the court imposed the fees because Caldwell had filed a duplicative motion. The limited record before us on appeal does not reveal the legal basis for the fees awarded nor allow us to review the trial court's decision. See RAP 9.2; Story v. Shelter Bay Co., 52 Wn. App. 334, 345, 760 P.2d 368 (1988) (appellant has burden of providing adequate record for review).

8

Caldwell also claims the trial court discriminated against her by denying her motion to compel discovery of financial information related to Hanselman's businesses just before trial and then denying her request to continue the trial. Again, based on the limited documentary record on appeal, it appears that the trial court ruled on summary judgment motions in December 2010. The court determined that, as a matter of law, Hanselman's businesses were his separate property and not subject to equitable distribution. The court denied Hanselman's summary judgment motion with respect to the residence and other items of personal property purchased during the relationship.

In February 2011, Caldwell sought the production of 35 categories of documents, many relating to Hanselman's businesses, including employee payroll records, timesheets and paychecks; lists of contractors; work orders; "fish tickets"; identification of customers and buyers; and invoices. Hanselman filed for a protection order objecting to the production of certain documents, and Caldwell filed a motion to compel.[2]

The court heard argument on the motions on April 25, 2011. The testimony at the hearing suggests that some business records had been provided, but Hanselman objected to the production of other documents as irrelevant and unduly burdensome. Caldwell argued that she needed the business records to show that Hanselman did not actually have the employees he claimed to have, which would support the inference that she must have been

---

[2] Neither of these motions is in the record.

helping Hanselman in his businesses. When the court asked Caldwell about the relevance of the evidence, even if it showed that she participated in the business, Caldwell said it was relevant to the issue of "credibility." She explained that the records would show that Hanselman was lying about the extent of her participation in the business and was therefore lying about the nature of the relationship.

The court informed the parties that it would take the issues under advisement but would issue a ruling quickly. Caldwell orally asked to continue the trial but did not state the length of the requested continuance or provide a reason. The court denied the oral request but indicated that a continuance might nevertheless be unavoidable because of another matter.

The court issued a ruling a few days before trial began granting the protective order on the basis that the contested discovery requested by Caldwell was unduly burdensome and not reasonably intended to lead to relevant evidence. Caldwell argues that her ability to present her case was hampered by both the discovery ruling and the subsequent denial of her request to continue.

Both discovery rulings and rulings on motions to continue are generally reserved to the broad discretion of the trial court. See Ameriquest Mortg. Co. v. Office of Attorney General of Wash., __ Wn.2d __, 300 P.3d 799, 804 (2013) (discovery rulings); Red Oaks Condo. Owners Ass'n v. Sundquist Holdings, Inc., 128 Wn. App. 317, 321, 116 P.3d 404 (2005) (continuances). While Caldwell claims that the trial court's ruling left her without access to evidence she needed

to prove her case, she failed to demonstrate that the business records were critical to establishing the existence of a committed intimate relationship. When limiting the scope of discovery, courts must balance the potential relevance of evidence against the burden imposed on the party being asked to respond. Nakata v. Blue Bird, Inc., 146 Wn. App. 267, 278, 191 P.3d 900 (2008), review denied, 165 Wn.2d 1033 (2009). In this case, in weighing the potential relevance against the burden, the court assumed that the records would show, as Caldwell claimed, that she was involved in the businesses. Caldwell argued only that this fact would bear on Hanselman's credibility in general. It was not unreasonable for the trial court to determine that that relative value of the evidence did not outweigh the burden that production of the documents would impose. And despite Caldwell's assertion that the court's ruling deprived her of the ability to impeach Hanselman's testimony, the trial transcript demonstrates that she challenged Hanselman's credibility directly with various inconsistent statements he made about the nature of the relationship.

Finally, with regard to the trial court's denial of her oral request to continue the trial, Caldwell claims that the court's ruling was discriminatory because the court had previously granted continuances requested by Hanselman's attorney. But there is no information in the record about the prior continuances to which Caldwell refers. It is clear that when Caldwell orally asked the court to continue the trial on April 25, she did not explain the basis for her request. And it does not

11

appear that Caldwell filed a written motion to continue upon receipt of the court's discovery ruling.

We have carefully examined the available record and have discovered no evidence that the trial court discriminated against Caldwell because of her pro se status or for any other reason. Nor does the record indicate that the court abused its discretion or acted unreasonably in imposing sanctions, ruling on discovery, or denying Caldwell's oral motion to continue. Instead, it appears that the court displayed considerable patience with Caldwell and appropriate sensitivity to the issues she raised at trial. We deny both parties' requests for fees and affirm.

Becker, J.

WE CONCUR:

Appelwick, J.

Spearman, A.C.J.

12